CASCO MARINA DEVELOPMENT,
L.L.C., Appellant,

v.

DISTRICT OF COLUMBIA REDE-
VELOPMENT LAND AGEN-
CY, et al., Appellees.

No. 02–CV–337.

District of Columbia Court of Appeals.

Argued March 17, 2003.

Decided Oct. 23, 2003.

Earl L. Siegel, for appellant.

James C. McKay, Jr., Senior Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, were on the brief for appellees.

Before RUIZ and GLICKMAN, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

In this appeal, CASCO Marina Development, L.L.C. ("CASCO"), contends that the trial court erred in granting the motion of appellees, the District of Columbia Redevelopment Land Agency (the "RLA") and RLA Board member Mr. Richard Levy, to dismiss CASCO's complaint on the ground that it failed to state a claim upon which relief may be granted, pursuant to Super. Ct. Civ. R. 12(b)(6). We agree and reverse.

## I.

This appeal arises out of CASCO's attempts to enter into an assignment agreement with MIF Realty Corp. ("MIF") whereby CASCO would become the tenant of a real estate parcel on the Washington Channel, which was at relevant times owned and leased by the RLA. The RLA was an agency of the District of Columbia, charged by statute with eliminating blight by administering the procurement, development, redevelopment, and maintenance of real property in the District in a manner that promotes public health, safety, morals, and welfare. D.C.Code § 5–801 et seq. (1981).[1] Pursuant to that authority, the RLA owned and leased out to MIF the subject parcel, Site E, Washington Channel Waterfront, known as the Gangplank Marina ("marina"). The instant action grew out of a June 1999 assignment agreement, whereby MIF, which is not a party

1. Recodified at D.C.Code § 6–301.01 et seq. (2001). On June 25, 2002, D.C. Act 14–398 (2002) was enacted, divesting the RLA of its authority and transferring it to the RLA Revitalization Corporation, a subsidiary of the National Capital Revitalization Corporation. 49 D.C.Reg. 6516 (2002). No motion has been filed seeking to substitute a party.

to the underlying suit or this appeal, sought to assign its tenancy of the marina to CASCO.[2]

Section 806 of MIF"s lease agreement provided in relevant part that MIF "may, subject to the provisions of Section 1008 hereof, sell, assign or transfer any of its rights, title or interests in and to the [marina] ... without the prior written consent of the [RLA] thereto ...." That section went on to provide, *inter alia,* that any assignee "shall expressly assume, by written instrument recorded in the Office of the Recorder of Deeds of the District, all of the covenants, agreements and obligations of [MIF] under this agreement ...." MIF was required to "furnish or cause to be furnished to the [RLA] for its approval a copy of the proposed aforesaid written instrument, and the RLA *shall* approve the same if it conforms to the provisions of the preceding sentence of this Section" (emphasis added). That provision was subject to § 807 of the lease, which read as follows: the RLA "(if [MIF] is not then in default in respect of any of its other obligations under this Agreement) shall promptly so certify ...." It did not address what is to be done in the event of such default.

Section 1008 of the lease provided that, "[d]uring the period of the continuance of a default or failure by [MIF] to perform or observe any covenant pursuant to Sections ... 601 or 606 hereof," even if the RLA had not given MIF the required notice of such default or failure, "[MIF] shall not be entitled to exercise the rights and privileges granted to it by Sections 801, 802, 803, and 1101 hereof."[3] In short, these three provisions taken together allowed MIF to transfer freely its interest in the marina, subject to the condition that MIF not be in default at the time of transfer. If MIF was not in default, then the RLA was bound to approve any agreement that conformed to the requirements of the lease and to produce certification of non-default.

Turning to the MIF–CASCO transaction, MIF"s attempts to assign the lease to CASCO proceeded as follows. MIF entered into a contract to assign its interest in the marina to CASCO in June 1999. By its terms, the contract was terminable by either party if not closed upon by November 22 of the same year, and would terminate automatically if the RLA should conclusively deny or refuse its consent. On August 17, MIF submitted the required written agreement and requested approval of the assignment contract and of CASCO's financing and a non-default certificate from the RLA. In response, the RLA indicated that it desired more information regarding CASCO's plans, and it scheduled hearings for October 7 and 21, at which it discussed those plans and the contract.

According to CASCO's complaint, the RLA gave no indication at those meetings or in related correspondence that it considered MIF to be in default. In a letter dated November 5, however, an Assistant Corporation Counsel notified MIF that he had concluded that MIF was in default for failure to repair promptly the damage caused by a 1996 fire, and to dispose properly of insurance proceeds. A meeting of the RLA Board was then held on Novem-

---

**2.** MIF had acquired its tenancy by transfer out of receivership from the previous tenant's 1996 bankruptcy.

**3.** Sections 806 and 807 are not expressly addressed in § 1008. However, those sections became a part of the agreement by way of amendment. Section 806 specifically declares that it is subject to the provisions of § 1008. Section 807 does not refer to § 1008 but, as quoted above, provides specifically that the RLA must certify that the redeveloper [MIF] is not in default if such is the case.

ber 18, 1999, at which the RLA announced that MIF was in default and that it would issue a letter to that effect, but that it was willing to overlook the defaults if it could renegotiate the terms of the lease. At that meeting, Mr. Levy expressed the following view:

> [A]ll we are attempting to do is to see that the City gets its fair share. In that regard, our counsel does firmly believe that this lease is in default. This gives us, we believe, the absolute[ly] appropriate opportunity to see that we make up for oversights of this Agency in the past and only to see that the City gets its fair share as articulated in the lease .... I am, in fact moving that we approve an assignment from MIF to CASCO with ... the provision ... that the lease [be] renegotiated within appropriate bounds ... that rectify the oversight of the RLA in its right to have an appraisal and rent reflect the current value of the land and ....
>
> MIF is in default on the lease and we are looking, quite honestly, at the leverage of getting what the City deserves out of this.

The RLA issued a notice of default on November 22, 1999. MIF contested the notice, arguing that it was not in default. Subsequently, MIF terminated the agreement with CASCO pursuant to its terms.

CASCO then filed the instant suit for tortious interference with contract, tortious interference with business advantage, and equitable estoppel, naming as defendants both the RLA and Mr. Levy.[4] The complaint contained five counts: one count of each tort against each defendant and the count for injunctive relief against only the RLA. It alleged that MIF was not in default, and that appellees asserted default solely in order to realize financial gain rather than for reasons related to performance under the contract. Appellees filed a motion to dismiss pursuant to Super. Ct. Civ. R. 12(b)(6) or, in the alternative, for summary judgment pursuant to Super. Ct. Civ. R. 56(c). Appellees argued to the trial court that they were entitled to judgment on the following bases: (1) appellees enjoyed immunity; (2) CASCO had failed to pursue in the Superior Court an appeal from the administrative ruling of the RLA; and (3) CASCO had failed to allege sufficient facts to warrant relief.[5] The trial court, relying on *Goddard v. District of Columbia Redevelopment Land Agency*, 109 U.S.App. D.C. 304, 287 F.2d 343 (1961) (delays in condemnation proceedings were discretionary and thus protected by immunity), granted the motion to dismiss pursuant to R. 12(b)(6), ruling that both appellees enjoyed immunity, and therefore not reaching the issues of whether MIF was in default or whether appellees had acted in bad faith. This appeal followed.

## II.

On appeal, CASCO contends that the trial court erred in ruling that appellees' actions were discretionary and therefore immune and, specifically, in relying on *Goddard* to support that ruling. CASCO further contends that appellees' alternative basis for affirmance—that CASCO failed

4. Initially, CASCO named the District of Columbia as a defendant rather than the RLA. By consent motion, the counts against the District were dismissed, and the RLA was named in the District's stead on the three counts against it.

5. Appellees also argued that the District should be dismissed as an improper party, and that the RLA should be dismissed for improper service. These two issues were effectively addressed by the consent motion to amend the complaint and the trial court's grant thereof and are not before us for review. See note 4, *supra*.

to plead adequate facts to withstand appellees' motion to dismiss—is also without merit.[6]

### 1. *Standard of Review*

The standard by which we review the grant of a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is well settled: like the trial court, we must construe the complaint in the light most favorable to the plaintiff, while taking the facts alleged in the complaint as true. *Cauman v. George Washington Univ.*, 630 A.2d 1104, 1105 (D.C. 1993). We will affirm a dismissal only " 'when "it appears, beyond doubt, that the plaintiff[ ] can prove no set of facts in support of [its] claim which would entitle it to relief." ' " *Id.* (quoting *Klahr v. District of Columbia*, 576 A.2d 718, 721 (D.C.1990) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))). We review the trial court's disposition of this action on the basis of immunity accordingly; and then consider appellees' alternative argument for affirmance—that appellant failed to plead sufficient facts to withstand appellees' motion—by the same standard. Our review of a dismissal on the grounds of governmental immunity is *de novo*. *Aguehounde v. District of Columbia*, 666 A.2d 443, 447 (D.C.1995).

### 2. *Immunity*

"Whether immunity is available ... turns upon whether the act complained of is discretionary or ministerial." *Nealon v. District of Columbia*, 669 A.2d 685, 690 (D.C.1995).[7] The inquiry into whether an action is discretionary "goes beyond whether the act entailed a choice among alternatives. It seeks to ascertain whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to ensure fearless, vigorous and effective decision making." *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C.1990) (citation and internal punctuation omitted).

To determine whether the District is immune to liability, we have long relied upon the "ministerial-discretionary" test. *Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C.1973). Governmental actors have no immunity from suit based upon their ministerial actions, but they are immune from suit based upon their discretionary actions. *Id.* While we have observed that identifying what actions are discretionary may at times require thorough analysis, *see Moss, supra,* 580 A.2d at 1020–21, performance under a lease contract neither requires nor leaves room for discretion. Appellees disagree, arguing that if that were the case, then the amendment to the original lease that enabled the lessee to transfer his or her estate in the absence of default could not have been achieved. That assertion, however, overlooks the fact that the amendment was a

---

**6.** CASCO's additional cause of action in equitable estoppel is not before us. As appellees observe, CASCO did not respond to appellees' arguments to the trial court on this point, nor did it argue the issue to this court in either the opening or reply brief. CASCO therefore has waived its equitable estoppel argument for purposes of this appeal.

**7.** As we explained in *Nealon:*

Generally, discretionary acts involve the formulation of policy, while ministerial acts involve the execution of policy. Discretionary acts have also been defined as acts that require personal deliberation, decision and judgment. They generally have a broad public effect and call for a delicate balancing of competing considerations. Where there is room for policy judgment and decision, there is discretion. In contrast, ministerial acts require little or no judgment, and generally constitute mere obedience to orders or performance of a duty in which the [municipal employee] has little or no choice.

*Id.* (internal punctuation and citations omitted).

mutual agreement, whereas the RLA's demand of renegotiation giving rise to the instant suit was unilateral. While the RLA is free to exercise discretion in initially entering a contract, or in deciding to seek to alter the terms of a contract, it is ministerially bound as a contracting party by the terms of a valid, existing contract unless and until *both parties to the contract agree* to amend it.

■ CASCO argues that under the MIF–RLA lease agreement, the RLA was contractually obliged to approve an assignment by a lessee who is not in default, and was obliged to determine in an appropriate manner whether a party was in default. It is clear that the RLA's obligation to approve assignments of the lease that fully conformed to the requirements of § 806 of the lease called for a ministerial act. Although it is not as obviously the case, we are satisfied also that the determination whether MIF was in default was also ministerial rather than discretionary, as it would not involve the formulation of policy, an exercise of judgment or a choice among non-contractual options, but rather would require the correct interpretation of a contract. Accepting the allegations as true, as we must at this stage, we are satisfied that these obligations of the RLA were ministerial in nature. Thus, the RLA has no immunity from suit based upon its alleged faulty performance or non-performance of these obligations under the contract.[8]

In this case, the trial court ruled, relying on *Goddard*, that appellees enjoyed sovereign immunity. *Goddard*, however, is distinguishable from the instant case. It involved a claim of misrepresentations by

the RLA about its plans involving condemnation, a matter expressly excluded from the coverage of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2680. It also involved a statute that clearly gave the RLA broad discretion to determine whether and when it was "necessary or advantageous" to use its condemnation power. *Goddard, supra,* 109 U.S.App. D.C. at 306, 287 F.2d at 345 (citation and internal punctuation omitted). It does not govern the outcome here.

■ In further support of the argument that appellees did not have immunity, CASCO draws our attention to *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988):

> [T]he discretionary function exception *will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.* In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Id.* at 536, 108 S.Ct. 1954 (citation omitted) (emphasis added). Here, there was a comparable municipal regulation. "A modification subsequent to execution of the Land Disposition Agreement shall be governed by the terms of the agreement." 10 DCMR § 2118.4 (1994). Per the terms of the agreement, the RLA was required (1) to approve of the form of assignment if it reflected an agreement by the assignee to assume fully the assignor's obligations under the lease, and (2) to issue a certificate

---

8. This is not to say, however, that if the RLA properly declared a default, its subsequent action in placing conditions on its approval of an assignment of the lease would also be ministerial. Without ruling on the matter, we observe that, to the contrary, a cogent argument could be made that, in that situation, the RLA could exercise its discretion as to what, if any, conditions it would place upon the assignment.

of non-default under the lease. Taking as true CASCO's allegations that the form of the assignment satisfied the terms of the lease, and that MIF was not in default at the time of the proposed assignment, as we again must, appellees failed their obligations under both 10 DCMR § 2118.4 and the lease, thus depriving them of immunity.[9]

### 3. *Failure to Plead Sufficient Facts*

Appellees contend that, should we disagree with the trial court's conclusion that they are immune from suit, we should nevertheless affirm because CASCO failed to allege facts underlying its claim of tortious interference with either contract or business expectancy sufficient to withstand a motion to dismiss. We disagree.

■ We are satisfied that CASCO pleaded facts sufficient to undergird its tortious interference with contract count. This court has stated that the elements of tortious interference with contract are: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach." *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C.2000) (footnote and citation omitted). The only element at issue in the instant case is the third one, intentional procurement of a breach of the contract.

Appellees argue that because MIF *cancelled* the CASCO–MIF contract pursuant to its terms, as opposed to *breaching* it,

CASCO cannot recover. To support this point, appellees direct our attention to *Paul, supra,* 754 A.2d at 309, and *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.,* 565 A.2d 285, 289–90 (D.C. 1989). *Sorrells*, however, actually undermines appellees' contention. In *Sorrells*, the court was faced with a similar situation—cancellation of a terminable contract induced by a third party—but nevertheless held that the third party had tortiously interfered with Sorrells's contract. Sorrells was an employee of a department store in the District who had been terminated at the behest of a supervisory employee for diminished sales performance resulting from unique restrictions placed upon Sorrells by the supervisory employee. Sorrells filed suit, *inter alia*, against the department store for wrongful termination and against the supervisor for tortious interference with her employment contract with the department store. The trial court granted the department store's motion for summary judgment, and the jury returned its verdict in favor of Sorrells against the supervisor.

■ On appeal, this court upheld both the ruling and the judgment. We observed that, in the District, employment contracts are at-will unless otherwise specified, and that, accordingly, the department store's termination of Sorrells's employment did not violate the terms of her employment contract. *Sorrells, supra,* 565

---

9. Appellees argue that, because CASCO did not raise this point before the trial court, it is waived. We disagree. As we have stated, "the judgment of the trial court may be affirmed on a ground not raised or considered below." *Sheetz v. District of Columbia,* 629 A.2d 515, 519 n. 5 (D.C.1993). In *Sheetz*, we reasoned that the material brought to our attention on appeal was not new evidence, but rather legal materials available for all. *Id.* The appellants in *Sheetz* had, as had the

appellees now before us, ample "opportunity to respond to the [opponent]'s arguments, and have suffered no procedural unfairness." *Id.* Indeed, as CASCO points out in its reply brief, the regulation was not only available to the RLA, but it was also promulgated by the RLA. Moreover, CASCO's regulation-based argument merely advances the same argument that CASCO has made throughout: that appellees' actions were ministerial and not discretionary.

A.2d at 285, 288–89. Thus, there was no breach of contract. Nevertheless, we affirmed the verdict against the supervisor for tortious interference with the contract for inducing the store's termination of the contract. *Id.* at 289–91. In doing so, we set forth the following:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person *not to perform the contract,* is subject to liability to the other for the pecuniary loss resulting to the other from the *failure of the third person to perform* the contract.

*Id.* at 290 (quoting RESTATEMENT (2D) OF TORTS § 766 (1979)) (emphasis added; emphasis in original removed). Therefore, while we have articulated the third element of tortious interference as procurement of breach, *Sorrells* establishes that a "breach" as such is not required, but merely a failure of performance, whether by the terms of the contract in question or not.[10] Thus, CASCO's pleadings are sufficient on this count, because they alleged the failure of the performance of the CASCO–MIF assignment contract.

▬▬ As to tortious interference with prospective business advantage, we are persuaded that CASCO pled sufficient facts to withstand a motion to dismiss on that count. The elements of tortious interference with prospective business advantage mirror those of interference with contract. *Brown v. Carr,* 503 A.2d 1241, 1247 (D.C.1986). To prevail, however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction. *See id.* The existence of such a prospect is not in contention here. Instead, appellees argue that, for both intentional interference counts, their actions were privileged, because they were taken merely in furtherance of their economic interests. Appellees draw our attention to case law from the Ninth Circuit and Alaska.[11] We disagree. We have specifically held that "a landlord may not for economic motives reasonably refuse consent to a sublease that fully protects the landlord's bargain under the prime lease." *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.,* 485 A.2d 199, 209 (D.C.1984). It is uncontroverted that CASCO sought to assume in totality the prime lease, thus protecting the RLA's bargain thereunder. If it is established that the RLA withheld its consent merely in order to "leverage" a better bargain for the District, that would constitute intentional interference with either a contract or business expectancy for purposes of a 12(b)(6) motion to dismiss.

### III.

We conclude that the trial court erred in ruling favorably on appellees' immunity argument. We further conclude that CASCO's complaint stated a cause of action sufficient to withstand a motion to dismiss. We emphasize again the standard under which we have found error in granting dismissal pursuant to Super. Ct. Civ. R. 12(b)(6): we will affirm such a dismissal only when it appears, beyond doubt, that the plaintiff can prove no set of facts in support of its claim that would entitle it to

---

10. *Paul v. Howard Univ., supra,* also relied upon by appellees, cites *Sorrells* and is not to the contrary.

11. *Hamro v. Shell Oil Co.,* 674 F.2d 784 (9th Cir.1982); *RAN Corp. v. Hudesman,* 823 P.2d 646 (Alaska 1991).

relief.[12]  We remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

**12.**  We do not consider appellees' alternative argument seeking summary judgment, which the trial court did not reach.