John **WASHKOVIAK**, et al., Appellants,

v.

**STUDENT LOAN MARKETING ASSOCIATION, Appellee.**

**No. 05-CV-63.**

District of Columbia Court of Appeals.

Argued Jan. 11, 2006.

Decided June 8, 2006.

Robert K. O'Reilly, pro hac vice, with whom Halley F. Ascher, William P. Butterfield, and Mark K. Strauss, pro hac vice, were on the brief for appellants.

Steven S. Rosenthal, with whom Jeffrey A. Tomasevich, and Maria Whitehorn Votsch and Robert S. Lavet, Senior Vice President and General Counsel, and Eric D. Reicin, Vice President and Associate General Counsel for Sallie Mae, Inc., were on the brief for appellee.

Before WASHINGTON, Chief Judge, RUIZ, Associate Judge, and FERREN, Senior Judge.

FERREN, Senior Judge:

Appellants John Washkoviak and Amy Dziondziakowski appeal an order of the trial court dismissing their amended com-

plaint. They allege that appellee, the Student Loan Marketing Association ("Sallie Mae"), violated provisions of the District of Columbia Consumer Protection Procedures Act and the common law of the District of Columbia. In its order, the trial court concluded that appellants did not establish sufficient contacts between their claims and the District of Columbia to justify application of District of Columbia law. Appellants contend that (1) the trial court improperly considered factual assertions extrinsic to the pleadings in ruling for Sallie Mae, and that (2) the trial court erred in concluding that District of Columbia law should not be applied to appellants' complaint. We reverse and remand the case to the trial court for further proceedings consistent with this opinion.

## I.

### A. The Parties

Appellants were the named plaintiffs in what they characterized as a nationwide class action suit against Sallie Mae.[1] Congress established Sallie Mae as "a private corporation which will be financed by private capital and which will serve as a secondary market and warehousing facility for student loans ... and which will provide liquidity for student loan investments." 20 U.S.C. § 1087–2(a) (2000). By law, Sallie Mae must "maintain its principal office in the District of Columbia and shall be deemed, for purposes of venue and jurisdiction in civil actions, to be a resident and citizen thereof." § 1087–2(b)(1). However, "[o]ffices may be established by [Sallie Mae] in such other place or places as it may deem necessary or appropriate for the conduct of its business." *Id.*

In 1996, Congress enacted the Student Loan Marketing Reorganization Act of

---

1. Mark Lensinger was named as a plaintiff in appellants' original complaint but not in the amended complaint that is the subject of this appeal.

1996, authorizing a restructuring that was to include the transfer of all Sallie Mae common shares to a holding company. 20 U.S.C. § 1087–3(a) (2000). According to the terms of the reorganization:

> On the reorganization effective date, employees of [Sallie Mae] shall become employees of the Holding Company (or any subsidiary of the Holding Company), and the Holding Company (or any subsidiary of the Holding Company) shall provide all necessary and appropriate management and operational support (including loan servicing) to [Sallie Mae], as requested by [Sallie Mae]. [Sallie Mae], however, may obtain such management and operational support from persons or entities not associated with the Holding Company.

§ 1087–3(c)(3). The statute further provided that until its "dissolution date, [Sallie Mae] shall continue to have all of the rights, privileges and obligations set forth in, and shall be subject to all of the limitations and restrictions of, section 1087–2 of this title, and [Sallie Mae] shall continue to carry out the purposes of such section." § 1087–3(c)(1).

Accordingly, the statute contemplated an effective date of "reorganization" and a subsequent date for Sallie Mae's "dissolution." But the statute did not specify either date. In fact, the statute required shareholder approval before the reorganization could commence. § 1087–3(b). Although the statute suggested methods by which the Board of Directors could effectuate the reorganization, it left the precise methods to the discretion of the Board of Directors, subject to approval by the shareholders. § 1087–3(a).[2]

**B. The 2001 Complaint.**

On December 21, 2001, appellants filed their original complaint against Sallie Mae. Although they characterized it as a class action complaint, they concede that they never moved for certification as required by D.C.Super. Ct. Civ. R. 23–I(b)(1).[3] Appellants' original complaint identified both Washkoviak and Dziondziakowski as Wisconsin residents. According to the complaint, Washkoviak acquired a federally guaranteed student loan through the International Beauty Academy, where he was enrolled between 1987 and 1989. Although the Great Lakes Higher Education Corporation "originated" the loan, Wash-

---

2. A note in the 2000 edition of the United States Code Annotated states that the reorganization occurred in August 1997, at which time, the newly formed SLM Holding Corp. "assumed control of the Student Loan Marketing Association," which became "a subsidiary of the Holding Corp." 20 U.S.C. § 1087–3 note (West 2000) (Repeal of Section). This information is found nowhere in the text of the statute.

Sallie Mae asserts in its brief that it "was dissolved as of December 2004," and that "SLM Corporation, the Delaware Corporation created pursuant to the Student Loan Marketing Association Reorganization Act of 1996, succeeded to all of its liabilities. Prior to its dissolution, the Student Loan Marketing Association's loan portfolio was serviced by Sallie Mae Servicing L.P., another wholly owned subsidiary of SLM Corporation." These sub-

sequent developments, however, are not part of the record before us. Nor are they described in 20 U.S.C. § 1087–3.

3. D.C.Super. Ct. Civ. R. 23–I(b)(1) (2003) provides:

> Within 90 days after the filing of a complaint in a case sought to be maintained as a class action, the plaintiff shall move for a certification under Rule 23(c)(1) that the case be maintained as a class action. Such motion shall be supported by a statement of facts which demonstrates that the action meets the requirements for a class action prescribed in Rule 23(a) and (b). With the motion, the plaintiff may file affidavits or other evidence of any or all of the facts stated and may submit that all or certain specified facts are not in genuine dispute.

koviak consolidated his loans with Sallie Mae in 1992. The complaint further stated that Dziondziakowski, who attended both Marquette University and the University of Wisconsin—Parkside, acquired a federally guaranteed student loan through Sallie Mae, which subsequently refinanced the loan.

Both Washkoviak and Dziondziakowski signed promissory notes payable to Sallie Mae. Each listed a Wisconsin address on the note. Washkoviak's promissory note indicated that all payments were to be sent to an address in Merrifield, Virginia, while Dziondziakowski's note instructed her to send her payments to an office in Wilkes–Barre, Pennsylvania. Although both promissory notes contained the following language—"this application/promissory note will be governed by Federal Law applicable to consolidation loans"—neither included a choice of law provision.

The allegations in the complaint concerned the manner in which Sallie Mae collects and discloses late fees. Appellants' promissory notes authorize Sallie Mae to collect a six percent fee for each late payment. According to the complaint, Sallie Mae engages in the practice of "pyramiding," by which it applies payments first to all outstanding late fees, and then, only after all late fees have been paid, to the required monthly payment of principal and interest. As a result, if a borrower's payment proves sufficient to cover the borrower's required monthly payment, but insufficient to cover that payment combined with any late fees owed, an outstanding balance, equal to the amount of the unpaid late fees, remains on the required monthly payment. Accordingly, the borrower is subsequently charged additional late fees for failing to pay the entire required monthly payment (including late fees) on the scheduled date. The complaint also said that Sallie Mae misrepresents the manner in which it collects late fees and misleads borrowers about the amount of late fees they owe.

Appellants then claimed that Sallie Mae's actions violated D.C.Code § 28–3904(f) (2001),[4] a disclosure provision of the District of Columbia Consumer Protection Procedures Act ("DCCPPA"), as well as D.C.Code § 28–3310(b)(2) (2001), which prohibits multiple delinquent or late charges "for the same delinquent or late periodic installment." They also maintained that Sallie Mae's conduct constituted a breach of contract.

In the complaint, appellants claimed that the practices in question were "instituted" in July 1998 by Sallie Mae Servicing Corporation, identified as a Delaware Corporation which acted as Sallie Mae's agent and "follow[ed] uniform, standardized loan servicing policies, procedures and business practices established and authorized by [Sallie Mae]," whose business was "transacted ... in the District of Columbia."

Sallie Mae filed a motion to dismiss pursuant to D.C.Super. Ct. Civ. R. 12(b)(6). In its motion, Sallie Mae argued, among other things, that federal law preempted the claims brought under the D.C.Code; that choice of law principles and "Constitutional concerns" precluded consideration of appellants' claims under the law of the District of Columbia; and that appellants had failed to state a claim for breach of contract. On February 28, 2003, the trial court dismissed appellants' complaint, agreeing with Sallie Mae that the counts alleging D.C.Code violations were preempted by federal law and that appel-

---

4. According to D.C.Code § 28–3904(f) (2001), "It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to ... *fail to state a material fact* if such failure tends to mislead." (Emphasis added.)

lants had failed to state a claim for breach of contract. Although the trial court declined to rule on the choice of law issues, it noted in a footnote:

> Even if the Court were not holding that these counts were preempted, it would have grave reservations about the viability of applying the District of Columbia's consumer protection law to these transactions, given that Plaintiffs all reside in Wisconsin, attended school there, applied for loans there, executed the promissory notes there, and made payments from there to non-District locations. Plaintiffs would have significant conflicts-of-law hurdles ... and constitutional ones.

On May 6, 2004, we affirmed the trial court's decision. *Washkoviak v. Sallie Mae* (*Washkoviak I*), 849 A.2d 37 (D.C. 2004). We noted, however, that appellants had failed to rely upon D.C.Code § 28–3904(e), despite making allegations of fraud and misrepresentation during oral argument and in their briefs.[5] It did not appear that federal law preempted a claim under that D.C.Code provision, in contrast to § 28–3904(f), *supra* note 4. We therefore granted appellants leave to amend their complaint "to plead fraud or misrepresentation with particularity." *Washkoviak I*, 849 A.2d at 38–39.

### C. The 2004 Amended Complaint

On September 15, 2004, appellants filed their amended complaint. Although they titled it, "First Amended Class Action Complaint," they once again failed to move for class-action certification pursuant to D.C.Super. Ct. Civ. R. 23–I(b)(1).[6] In this amended complaint, appellants alleged intentional misrepresentation, reckless misrepresentation, and negligent misrepresentation, in violation of the common law of the District of Columbia, as well as of D.C.Code §§ 28–3904(e)[7] and 3905,[8] both of which are sections of the DCCPPA.[9] The amended complaint repeated appellants' claims that Sallie Mae had engaged in the practice of "pyramiding," or imposing "multiple late charges for as little as one late payment of principal and interest by the borrower." The amended complaint also alleged that Sallie Mae makes affirmative misrepresentations that cause borrowers to incur late fees continuously. These purported misrepresentations include: indicating on a borrower's monthly statement that the balance of late fees is zero, even if a late fee has been assessed; informing a borrower that Sallie Mae will charge late fees if the borrower fails to make payments, when, according to the complaint, Sallie Mae charges late fees regardless of whether borrowers make payments; and deceptively excluding from the total amount due specified on borrowers' monthly invoices any "deficienc[ies] caused by the late fees." According to appellants, these misrepresentations can potentially lead a borrower into believing that he or she is making a payment sufficient to cover the entire monthly installment when, in fact, although it may prove

---

5. According to D.C.Code § 28–3904(e) (2001), in language similar to that of subsection f, *supra* note 4, "It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to ... *misrepresent as to a material fact* which has a tendency to mislead." (Emphasis added.)

6. *See supra* note 3.

7. *See supra* note 5.

8. D.C.Code § 28–3905 (2001) provides the complaint procedures under the DCCPPA.

9. The complaint also included claims of breach of contract and unjust enrichment, both of which were either expressly or implicitly abandoned, and neither of which is the subject of this appeal.

sufficient to cover principal and interest, it is insufficient to cover those amounts combined with any late fees owed. If this occurs, an outstanding balance remains on the principal, and additional late fees are assessed against that balance.

Appellants' amended complaint omitted the assertion, made in the original complaint, that the challenged policies were instituted in 1998. Unlike the original complaint, moreover, the amended complaint failed to identify the schools that appellants attended and through which appellants obtained their loans. Furthermore, the amended complaint no longer contended merely that Sallie Mae Servicing Corp. had "instituted" the policies in question. This time appellants alleged that Sallie Mae had "instituted and mandated the policies and procedures yielding the violations in the District of Columbia," and that "all such policies and procedures emanate from the District of Columbia." Appellants did, however, reassert that Sallie Mae Servicing Corp. "follow[ed] uniform, standardized loan servicing policies, procedures and business practices established and authorized by [Sallie Mae]." And they added that Sallie Mae Servicing Corp. had originally been established by Sallie Mae "as a division," and that Sallie Mae and Sallie Mae Servicing Corp. were currently "under the same corporate ownership."

Again, Sallie Mae filed a motion to dismiss pursuant to D.C.Super. Ct. Civ. R. 12(b)(6) and R. 41(b), arguing among other things that appellants could not demonstrate the existence of contacts between the transactions at issue and the District of Columbia sufficient to establish that the District of Columbia had a greater governmental interest in applying its law than Wisconsin had. Appellants countered that the complaint sufficiently established that the District of Columbia had the greater interest because Sallie Mae "is by virtue of federal law a 'resident' of the District of Columbia," and that "the deceptive and unfair policies and practices at issue in this case were formulated and conceived by Sallie Mae in the District of Columbia, were directed by Sallie [sic] from the District of Columbia, and emanated from Sallie Mae in the District of Columbia." Sallie Mae replied that, as a result of the Student Loan Marketing Reorganization Act of 1996, it no longer had any employees in 1998, the year in which the original complaint alleged that Sallie Mae had implemented the challenged policies. According to Sallie Mae, because it "had no employees in 1998, none was (or could have been) located in the District of Columbia."

Sallie Mae's motion to dismiss referenced the factual assertions appellants had included in their original complaint but omitted from their amended complaint. To demonstrate that appellants lived, attended school, and obtained their loans in Wisconsin, and that appellants' loans were serviced outside of Washington, D.C., Sallie Mae attached appellants' promissory notes to its motion to dismiss. Later, as an attachment to its reply to appellants' opposition to the motion, Sallie Mae supplied an affidavit from Sallie Mae, Inc.'s Vice President of Policy in which she stated that, to the best of her knowledge, the decision to implement the policy at issue was not made in the District of Columbia, and that neither Sallie Mae, Sallie Mae Servicing Corporation, nor Sallie Mae, Inc., ever had processed loans or payments in the District of Columbia, received loan applications or payments in the District of Columbia, or mailed statements from the District of Columbia.[10] Appel-

10. Sallie Mae, Inc. is described as a successor to Sallie Mae Servicing Corporation.

lants responded by chiding Sallie Mae for "attempting to introduce purported facts extrinsic to the complaint," arguing that Sallie Mae should not be allowed to "treat this motion as one for summary judgment."

On December 27, 2004, the trial court granted Sallie Mae's motion to dismiss. In response to appellants' arguments that Sallie Mae had relied improperly upon factual assertions extrinsic to the pleading, the trial court referred to a comment in its order dismissing appellants' original complaint. There, the court had reasoned that the promissory notes may "be considered without altering the procedural posture of the Motion" because "they are documents that are indisputably authentic; are in [appellants'] possession, and are part of the contracts specifically referenced in the complaint." The trial court also concluded that it could consider any facts alleged in the first complaint but omitted from the amended complaint. The trial court did not expressly address the propriety of Sallie Mae's inclusion of the affidavit.

The trial court analyzed the choice of law issues by applying the modified governmental interest analysis we articulated in *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C.1995). The trial court examined consumer protection statutes from Wisconsin and the District of Columbia and determined that both jurisdictions "have essentially equal interests in protection of consumers." [11] The trial court also considered "the place where the injury occurred," "the place where the conduct causing the injury occurred," "the domicile, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship is centered."

The trial court first found that "the alleged injury occurred in Wisconsin, where Plaintiffs lived and were forced to make higher payments." The court then noted that "[t]he conduct causing the injury arguably occurred in Virginia and Pennsylvania, where the loans were processed" [12] but acknowledged that "it could also be said to have occurred in the District, where Defendant's policy was formulated." Next, the trial court observed that "[t]he domicile and residence of Plaintiffs is Wisconsin" and that "[b]y statute, defendant's principal office is required to be in the

---

**11.** As stated previously, appellants never moved for class certification pursuant to D.C.Super. Ct. Civ. R. 23–I(b)(1). *See supra* notes 3 and 6 and accompanying text. It was therefore appropriate for the trial court to limit its choice of law analysis to the laws of Wisconsin and the District of Columbia. If appellants had moved for certification, however, it would have been necessary, in determining whether class action certification was available and, if so, what jurisdiction's law to apply, for the trial court to conduct "an individualized choice-of-law analysis" with respect to the claims of each member of the class. *See In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir.2005) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822–23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)). *See also Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 312 (5th Cir.2000) (concluding, where named plaintiffs, all residents of Texas, sought to bring class action on behalf of class members in all fifty states and the District of Columbia against defendant whose most significant United States contacts were with Georgia, that it was necessary for the trial court, prior to certification, to "compare Georgia's contacts and the state policies those contacts implicate with those of the 50 other interested jurisdictions"). We express no opinion about the availability of class action certification at this stage in the proceedings or the potential outcome of a choice of law analysis made within the context of a motion for class action certification brought on behalf of a nationwide class.

**12.** As stated previously, the return address on Washkoviak's promissory note is in Virginia, while the return address on Dziondziakowski's promissory note is in Pennsylvania.

District, and it is deemed to be a resident of the District for purposes of venue and jurisdiction." Nonetheless, according to the trial court:

> [A]ll of the activity related to [appellants'] loans occurred in Defendant's offices outside the District. In fact [appellants] alleged in their original Complaint that the improper policy of imposing late fees was adopted in 1998, but, under the Student Loan Marketing Association Reorganization Act of 1996, [Sallie Mae] ceased to have any employees before 1998, and all of its functions were transferred to other affiliates, which are not alleged to be located in the District.

Finally, the trial court stated that "the relationship is centered in Wisconsin, where all of the critical activity occurred." Summarizing the situation, the trial court said that "the only significant point raised by [appellants] in favor of their position is that the federal statute deems [Sallie Mae] a resident of the District for venue and jurisdiction purposes." In the trial court's opinion, "[t]hat is not enough when weighed against the other factors counseling against the application of District law." Concluding that "the factors militate in favor of not applying the District's laws," the trial court dismissed the statutory counts with prejudice and the common law fraud counts without prejudice, granting appellants permission to "file another amended complaint for fraud and misrepresentation under Wisconsin common law and consumer protection law." Appellants declined to file another amended complaint, choosing instead to bring this appeal.[13]

## II.

### A. The Trial Court Improperly Relied Upon Facts Extrinsic to the Complaint

Appellants argue that "the trial court relied on purported facts extrinsic to the complaint [in concluding] that the loan servicing operations in question have been relocated outside the District of Columbia," and "impermissibly resolved disputed facts in favor of defendant." We agree.

We review a "dismissal for failure to state a claim *de novo*." *Oparaugo v. Watts*, 884 A.2d 63, 75 (D.C.2005) (citing *Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 (D.C.1999)). "[L]ike the trial court, we must construe the complaint in the light most favorable to the plaintiff, while taking the facts alleged in the complaint as true." *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 81 (D.C.2003) (citing *Cauman v. George Washington Univ.*, 630 A.2d 1104, 1105 (D.C.1993)). "Any uncertainties or ambiguities involving the sufficiency of the complaint must be resolved in favor of the pleader, and generally, the complaint must not be dismissed because the court doubts that plaintiff will prevail." *Atkins v. Industrial Telecommunications Ass'n, Inc.*, 660 A.2d 885, 887 (D.C.1995) (citing *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 203 (D.C.1979)).

"[A] defendant raising a 12(b)(6) defense cannot assert any facts which do not appear on the face of the complaint itself." *Carey v. Edgewood Mgmt. Corp.*, 754 A.2d 951, 954 (D.C.2000). "When the trial court decides a Rule 12(b)(6) motion by considering factual material outside the complaint, the motion shall be treated as if filed pursuant to Rule

---

13. Appellants acknowledged at oral argument that, by filing this appeal, they waived any right to file suit under Wisconsin law.

56, which permits the grant of summary judgment if there are no material facts in dispute and the movant is entitled to judgment as a matter of law." *Kitt v. Pathmakers, Inc.*, 672 A.2d 76, 79 (D.C.1996). "[W]hen treating a Rule 12(b)(6) motion as a motion for summary judgment, where outside factual material is not excluded, the trial court must give 'the parties notice of its intention to consider summary judgment and an adequate opportunity to present affidavits or other matters appropriate to a ruling on such a motion.'" *Id.* at 79–80 (quoting *Bernay v. Sales*, 435 A.2d 398, 402 n. 4 (D.C.1981)). *See also* Super. Ct. Civ. R. 12(b)(6) (2003); *Vincent v. Anderson*, 621 A.2d 367, 372–73 (D.C. 1993).

■■ The trial court's consideration of appellants' promissory notes, which Sallie Mae attached to its motion to dismiss, was insufficient to convert Sallie Mae's 12(b)(6) motion into a motion for summary judgment, because appellants themselves referred to the promissory notes in their original complaint. Courts may consider documents "incorporated in the complaint" when considering a 12(b)(6) motion. *EEOC v. St. Francis Xavier Parochial Sch.*, 326 U.S.App. D.C. 67, 70, 117 F.3d 621, 624 (1997).[14] In contrast, the affidavit of Sallie Mae, Inc.'s Vice President of Policy unquestionably alleged facts extrinsic to the pleadings, namely, that Sallie Mae had not decided upon the alleged "pyramiding" scheme in the District of Columbia, had not processed loans or payments in the District of Columbia, had not received loan applications or payments in the District of Columbia, and had not mailed statements from the District of Columbia. Of controlling significance, the trial court relied on the contents of this affidavit when making its determination. The court found that

"all of the activity related to [appellants'] loans occurred in Defendant's offices outside the District," and that "under the Student Loan Marketing Association Reorganization Act of 1996, [Sallie Mae] ceased to have any employees before 1998, and all of its functions were transferred to other affiliates, which are not alleged to be located in the District."

When the trial court found that "all of the activity related to [appellants'] loans occurred in Defendant's offices outside the District" and that appellants loans were processed in Virginia and Pennsylvania, it was, arguably, merely acknowledging that the return addresses on the promissory notes were in Virginia and Pennsylvania. But the court's words imply reliance on a more comprehensive set of facts. It does not appear that the trial court could conclude that Sallie Mae conducted *no* activity related to appellants' loans in the District without considering the facts alleged in the affidavit of Sallie Mae, Inc.'s vice-president.

■ The trial court depended, in part, upon the Student Loan Marketing Association Reorganization Act of 1996, 20 U.S.C. § 1087–3, *see supra* text accompanying note 2, when it concluded that Sallie Mae "ceased to have any employees before 1998" and that "all of [Sallie Mae's] functions were transferred to other affiliates, which are not alleged to be located in the District." In support of that finding, Sallie Mae relies on *Gaither v. District of Columbia*, 333 A.2d 57, 59 (D.C.1975), to advance its argument that, after noting the statute, the trial court "was entitled to take judicial notice of the *effect* of [the statute] on Sallie Mae's operations." (emphasis added). In *Gaither*, we observed that statutes enacted by Congress specifi-

---

**14.** *See American Ins. Co. v. Smith,* 472 A.2d 872, 873 n. 3 (D.C.1984) ("Super.Ct.Civ. R. 12(b) is identical to its federal counterpart, Fed.R.Civ.P. 12(b).").

cally granted control of Lorton Reformatory to the District of Columbia, then concluded that the trial court had properly taken judicial notice of the District of Columbia's ownership and operation of the reformatory because "it is clear that a reasonable person with reasonable knowledge of the District of Columbia community would understand that the District owns and operates its own reformatory." *Id.* In contrast, the conclusion that Sallie Mae ceased to operate in any manner in the District of Columbia prior to the implementation of the policies in question is neither apparent from the statutory text of 20 U.S.C. § 1087–3 nor self-evident.

■ Earlier, we quoted the statute authorizing Sallie Mae's reorganization, 20 U.S.C. § 1087–3, and providing that "[o]n the reorganization effective date, employees of [Sallie Mae] shall become employees of the Holding Company [or its subsidiaries], and the Holding Company [or its subsidiaries] shall provide all necessary and appropriate management and operational support . . . to [Sallie Mae], as requested by [Sallie Mae]." *Id.* § 1087–3(c)(3). But the statute itself does not offer assurance that the reorganization ever occurred. A note in the United States Code Annotated says that the reorganization occurred in 1996. However, *Gaither's* statement, that a court may take "judicial notice of laws and statutes of the jurisdiction in which the court sits," 333 A.2d at 59, does not extend to unofficial annotations to those laws and statutes. Furthermore, Sallie Mae's additional argument—that the reorganization, and Sallie Mae's subsequent dissolution, are matters of public record "detailed in filings . . . with the Securities and Exchange Commission"—carries no weight. Even if the trial court were entitled to take judicial notice of these filings,[15]

there is no indication in the record that the court ever considered them.

In any event, judicial notice of a reorganization and dissolution—especially one that retains Sallie Mae as a subsidiary of a holding company until dissolution is complete—does not necessarily demonstrate that Sallie Mae, or any other company that provided support for the relevant functions, no longer engaged in any operations nor had any employees in the District of Columbia in 1998. Such a conclusion necessarily would require reference to facts extrinsic to the complaint. Indeed, the statute itself makes clear that the corporate structure was in flux for quite awhile. According to 20 U.S.C. § 1087–3(c)(1), "until the dissolution date, [Sallie Mae] shall continue to have all of the rights, privileges and obligations set forth in, and shall be subject to all of the limitations and restrictions of, section 1087–2 of this title, and [Sallie Mae] shall continue to carry out the purposes of such section." The statute further provided that Sallie Mae could obtain "management and operational support from persons or entities not associated with the Holding Company" after the reorganization date but prior to the dissolution. § 1087–3(c)(3). Sallie Mae does not allege that the actual dissolution occurred prior to 1998. In fact, in its brief, Sallie Mae suggests that the dissolution was not complete until 2004. *See supra* note 2.

When the court relied on facts asserted by affidavit, it effectively converted Sallie Mae's motion to dismiss into a motion for summary judgment, even though it continued to style its ruling as a dismissal under Rule 12(b)(6) for failure to state a claim. *Kitt,* 672 A.2d at 79. However, nothing in the record indicates that the trial court gave appellants any "notice of its intention

15. *See In re Estate of Barfield,* 736 A.2d 991, 996 n. 7 (D.C.1999) ("[T]he trial court is entitled to take judicial notice of matters of public record.").

to consider summary judgment and an adequate opportunity to present affidavits or other matters appropriate to a ruling on such a motion." *Id.* at 80. Accordingly, the trial court erred in considering the affidavit without providing appellants the opportunity to submit evidence.

**B. The Trial Court Erred when it Concluded, Based Solely on the Pleadings, that Wisconsin Law Applied to Appellants' Amended Complaint**

Although we have concluded that the trial court erred in considering factual allegations extrinsic to the complaint, we are "free to affirm the dismissal, with respect to any count, if, viewing only the complaint, we were to conclude that the count being examined failed to state a claim upon which relief could be granted." *Id.* at 80 n. 6. (citing *Sheetz v. District of Columbia,* 629 A.2d 515, 519 n. 5 (D.C. 1993)). *See also Foretich v. CBS, Inc.,* 619 A.2d 48, 55 (D.C.1993) ("The court has applied a harmless error rule where the trial court's decision to dismiss under Rule 12 can be justified without reference to the material outside of the pleadings.") (citation omitted). "However, 'for this court to affirm such a dismissal, it must be self-evident from the face of the complaint, resolving all doubts in favor of the plaintiff, that the plaintiff is not entitled to any relief.'" *Kitt,* 672 A.2d at 80 n. 6 (quoting *Tele–Communications of Key West v. United States,* 244 U.S.App. D.C. 335, 340, 757 F.2d 1330, 1335 (1985)). Applying this standard, we cannot say that it is self-evident from the face of the complaint that Wisconsin law applies to appellants' amended complaint.

"Choice of law issues are normally treated as questions of law subject to *de novo* review by this court, meaning, we make an independent determination of which state law to apply." *Atkins,* 660 A.2d at 888 (internal citation omitted). We employ "a modified 'governmental interests analysis' which seeks to identify the jurisdiction with the 'most significant relationship' to the dispute." *Moore v. Ronald Hsu Constr. Co.,* 576 A.2d 734, 737 (D.C. 1990) (quoting *Hercules & Co. v. Shama Rest.,* 566 A.2d 31, 40–41 (D.C.1989)). Under this analysis,

we evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review. . . . As part of this analysis, we also consider the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145:

a) the place where the injury occurred;

b) the place where the conduct causing the injury occurred;

c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

d) the place where the relationship is centered.

*Coleman,* 667 A.2d at 816 (citation omitted).

We cannot say that the policies of either jurisdiction would be more advanced than the policies of the other by the application of its law to appellants' complaint. Wisconsin has a powerful interest in protecting its residents from fraud and misrepresentation,[16] while the District of Co-

---

16. The "underlying purposes and policies" of the Wisconsin Consumer Act are:

(a) To simplify, clarify and modernize the law governing consumer transactions;

(b) To protect customers against unfair, deceptive, false, misleading and unconscionable practices by merchants;

(c) To permit and encourage the development of fair and economically sound con-

lumbia has an equally strong interest in ensuring that its corporate citizens refrain from fraudulent activities.[17] Thus, we look at the two jurisdictions' respective relationships to the complaint by examining the four factors set forth in the Restatement. As to the first, appellants' injuries occurred in Wisconsin, where appellants received the alleged misrepresentations and made their payments. On the other hand, as to the second factor, appellants have alleged that Sallie Mae's "pyramiding" scheme was "formulated and conceived by Sallie Mae in the District of Columbia[,] ... directed by [Sallie Mae] from the District of Columbia, and emanated from Sallie Mae in the District of Columbia." As "we must construe the complaint in the light most favorable to [appellant]" and take "the facts alleged in the complaint as true," *Casco Marina Dev., L.L.C.,* 834 A.2d at 81, we must assume, for the purposes of this appeal, that the conduct causing the injury occurred in the District of Columbia.

With regard to the third Restatement factor, Sallie Mae was incorporated in the District of Columbia and was a District of Columbia resident, while appellants are residents of Wisconsin. Finally, as to the fourth factor, the relationship between appellants and Sallie Mae is centered in Wisconsin. *See Ivanhoe Fin., Inc. v. High-*

*land Banc Corp.,* No. 03–C–7336, 2004 WL 546934, at *4, 2004 U.S. Dist. LEXIS 2966, at 12–13 (N.D.Ill. Feb. 26, 2004) (finding that, where borrowers and lenders resided in different jurisdictions, "the parties' relationship is centered ... where the loan applications were prepared and the borrowers and the property securing the loans are located"). Therefore, two of the Restatement factors favor Wisconsin, one factor favors the District of Columbia, and one factor is split evenly between the two.

 "[I]t must be remembered," however, "that a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale." *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1072 (3d Cir.1996) (citing *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854, 856 (1970)); *accord Danner v. Staggs,* 680 F.2d 427, 431 (5th Cir.1982); *Lange v. Penn Mut. Life Ins. Co.,* 843 F.2d 1175, 1180 (9th Cir.1988); *St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP,* 233 F.Supp.2d 171, 178 (D.Mass.2002). *See also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971) ("[C]ontacts are to be evaluated according to their relative importance with respect to the particular issue."). According to the Restatement, moreover, "the place of injury is less significant in the

---

sumer practices in consumer transactions; and

(d) To coordinate the regulation of consumer credit transactions with the policies of the federal consumer credit protection act. WIS. STAT. § 421.102(2)(a)-(d) (2005). According to the Supreme Court of Wisconsin, "an educational institution, such as the University of Wisconsin and other public and private, nonprofit institutions of higher learning are not merchants under the Consumer Act ... The Consumer Act, however, does apply to college student loans obtained from merchants, such as private financial institutions, banks, savings & loans, credit unions, etc." *Board of Regents of Univ. of Wisconsin Sys. v.*

*Mussallem,* 94 Wis.2d 657, 289 N.W.2d 801, 807 (1980) (internal footnote omitted).

17. According to D.C.Code § 28–3901(b)(1)–(3) (2001), the purposes of the DCCPPA are to

(1) assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices; (2) promote, through effective enforcement, fair business practices throughout the community; and (3) educate consumers to demand high standards and seek proper redress of grievances.

case of fraudulent misrepresentations" than "in the case of personal injuries and of injuries to tangible things" or cases of false imprisonment and malicious prosecution. *Id.* § 145 cmt. f.

Given the discounted value of the place of injury in cases, such as this one, involving claims of misrepresentation, we cannot say that a qualitative weighing of the factors clearly favors Wisconsin. Indeed, given the lack of evidence available in the record defining the connections between appellants' claims and either jurisdiction, it is difficult to make any kind of qualitative judgment at all. However, because we must make our choice of law determination in the context of a 12(b)(6) motion, "accept[ing] the allegations of the complaint as true, and constru[ing] all facts and inferences in favor of the plaintiff," *Atkins*, 660 A.2d at 887, we must resolve any uncertainty in appellants' favor.

■ Alternatively, because we cannot determine from the pleadings which jurisdiction has a greater interest in the controversy, in ruling on a motion to dismiss we must apply the law of the forum state, which in this case is the District of Columbia. *See Logan v. Providence Hosp. Inc.*, 778 A.2d 275, 278 (D.C.2001)) ("[W]hen both jurisdictions have an interest in applying their own laws to the facts of the case, the forum law will be applied unless the foreign jurisdiction has a greater interest in the controversy.") (internal punctuation and citations omitted). Under either approach, therefore, the tie would appear to go to appellants for purposes of ruling on Sallie Mae's motion.[18]

---

18. We noted in *Hercules* that Restatement (Second) of Conflict of Laws § 148 (1971) "provides a useful framework for selecting the law which applies to multi-state misrepresentation claims." 566 A.2d at 43. There, we applied six factors provided in § 148 for determining which jurisdiction has the more significant relationship to the complaint in cases where a plaintiff relied on a misrepresentation in a jurisdiction other than that in which the defendant made the misrepresentation. *Hercules*, 566 A.2d at 43. Those factors are:

> (a) the place where the plaintiff relied on the defendant's misrepresentations;
> (b) the place where the plaintiff received the misrepresentations;
> (c) the place where the defendant made the misrepresentations;
> (d) the domicile and place of incorporation and place of business of the parties;
> (e) the place where the tangible thing which is the subject of the transaction between the parties was situated at the time; and
> (f) the place where the plaintiff is to render performance under the contract which he has allegedly been induced to enter by fraud.

*Id.* (quoting Restatement (Second) of Conflict of Laws § 148).

Here, the first two factors favor Wisconsin, the third favors the District of Columbia, the fourth would favor neither jurisdiction over the other, and the final two would be of questionable applicability, since no "tangible thing" serves as a subject of the transaction between appellants and Sallie Mae, and appellants do not allege fraud in the inducement of the contract. Although, according to the Restatement, no proscribed rules govern the weighing of these factors, the Restatement offers the following guidance:

> If any two of the above-mentioned contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues. So when the plaintiff acted in reliance upon the defendant's representations in a single state, this state will usually be the state of the applicable law, with respect to most issues, if (a) the defendant's representations were received by the plaintiff in this state, or (b) this state is the state of the plaintiff's domicil or principal place of business, or ... (d) this state is the place where the plaintiff was to render at least the great bulk of his performance under his contract with the defendant.

§ 148 cmt j. If we were to apply the above formulation mathematically, the factors would weigh heavily in favor of applying Wis-

We leave open the possibility that, after both parties have been afforded the opportunity to conduct discovery and present evidence, the trial court may conclude, upon motion for summary judgment, that Wisconsin has a greater interest than the District of Columbia in the resolution of this controversy and, accordingly, will enter judgment for Sallie Mae. But that may not be the case. We conclude only that, within the present context of a 12(b)(6) motion to dismiss, in which all of appellants's factual allegations must be accepted as true and all facts and inferences construed in appellants' favor, it is not clear that the law of Wisconsin should be applied rather than the law of the District of Columbia at this point in the proceedings. We conclude, therefore, that the trial court should not have granted Sallie Mae's motion to dismiss.[19] We reverse and remand the case to the trial court for further proceedings consistent with this opinion.

*So ordered.*

RUIZ, Associate Judge, concurring:

I fully join Judge Ferren's opinion for the court holding that, because of the presumptions operative at this early juncture in the litigation, an analysis of the underlying claims' ties to the District of Columbia favor application of the law of the forum. Our analysis at this point has not required an in-depth review of the corresponding provisions of relevant D.C. and Wisconsin law for the protection of consumer debtors, because we have proceeded from the trial court's determination—not challenged by the parties—that both states have "essentially equal interests in protection of consumers." *See ante* at 176. Therefore we have not had occasion to consider whether, if Wisconsin's interest in consumer protection would be furthered by application of D.C. law in this instance, this case presents a "false conflict" of laws. *See Kaiser–Georgetown Community Health Plan, Inc. v. Stutsman,* 491 A.2d 502, 509–11 (D.C. 1985).

consin law. However, in *Hercules,* we employed § 148 only as a "useful framework." We did not adopt it as a test to be mechanically applied. *See Emery Corp. v. Century Bancorp., Inc.,* 588 F.Supp. 15, 18 (D.Mass. 1984) (rejecting a "mechanical application of Restatement standards"). As stated previously, a jurisdiction's contacts are to be measured qualitatively rather than quantitatively. *LeJeune,* 85 F.3d at 1072. Even under the § 148 framework, therefore, we perceive that the result here is, at best, ambiguous, especially given the irrelevancy of two of the factors.

19. Sallie Mae cites *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), for the dubious proposition that its due process rights would be violated by the application of the law of the District of Columbia. In *Shutts,* the United States Supreme Court held that a state "must have a 'significant contact or significant aggregation of contacts' to the *claims* asserted by each member of the plaintiff class ... in order to ensure that the choice of [that state's] law is not arbitrary or unfair." *Id.* at 821–22, 105 S.Ct. 2965 (emphasis added) (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)). Because Sallie Mae is, by statutory requirement, incorporated in the District of Columbia and a resident of the District of Columbia, and because we must accept as true appellants' allegations that Sallie Mae formulated and implemented the policies at issue in the District of Columbia, we do not see how, based on this record, it can reasonably be argued that the District of Columbia did not have sufficient contacts to the claims alleged in appellants' complaint.