# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 7, 2014            Decided September 5, 2014

No. 13-7032

IN RE: APA ASSESSMENT FEE LITIGATION,

ELLEN G. LEVINE, ON BEHALF OF HERSELF AND ALL OTHERS
SIMILARLY SITUATED, ET AL.,
APPELLANTS

FRANK SUMMERS, ET AL.,
APPELLANTS

v.

AMERICAN PSYCHOLOGICAL ASSOCIATION AND AMERICAN
PSYCHOLOGICAL ASSOCIATION PRACTICE ORGANIZATION,
DEFENDANTS, JOINTLY AND SEVERALLY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01780)

———

*Hassan A. Zavareei* argued the cause and filed the briefs
for appellants. *Greg E. Mason* entered an appearance.

*David W. Ogden* argued the cause for appellees. With
him on the brief were *Jonathan E. Paikin* and *Francesco
Valentini*.

Before: ROGERS, GRIFFITH and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: The American Psychological Association (the APA) is a national nonprofit organization representing clinical, research, and academic psychologists. APA members must pay annual association fees billed by the organization on its yearly "Membership Dues Statement." For certain members, the dues statement also includes a separate, "special assessment" fee. At all relevant times, the dues statement's instructions informed affected members that they "MUST PAY" the special assessment. Despite that mandatory language, the special assessment in fact was not a requirement of APA membership. Instead, it was an optional payment collected by the APA to fund the lobbying activities of a separate, APA-affiliated organization.

After learning that there was no requirement to pay the special assessment to maintain APA membership, several members brought the present class action lawsuit seeking recovery of all special assessment fees paid. They alleged that the APA had intentionally misled members into believing that payment of the special assessment fee was a condition of membership, and that they would not have paid the fee had they known it was optional. The district court dismissed all of plaintiffs' claims based in principal part on a conclusion that plaintiffs could not have reasonably believed that the assessment fee was mandatory rather than optional. We disagree with that conclusion, among others, and we therefore reverse in part the dismissal of plaintiffs' claims.

3

I.

A.

The case is before us on a motion to dismiss, so we accept the facts as alleged in the complaint. *See Oberwetter v. Hilliard*, 639 F.3d 545, 549 (D.C. Cir. 2011). The American Psychological Association is "the world's largest organization representing psychologists." Compl. ¶ 15. Headquartered in Washington, D.C., the APA has more than 100,000 members. Compl. ¶ 2.

The organization claims tax-exempt status under § 501(c)(3) of the Internal Revenue Code, which limits the APA's ability to engage in lobbying and advocacy. Compl. ¶¶ 2, 5. Recognizing that restriction, the APA's leadership in 2001 created a companion organization—the American Psychological Association Practice Organization (the APAPO)—to "conduct[] professional advocacy and lobbying on behalf of members." Compl. ¶¶ 3, 15. The APAPO is organized under § 501(c)(6) of the Internal Revenue Code, which permits lobbying activities forbidden to the APA under § 501(c)(3). *See Am. Soc'y of Ass'n Execs. v. United States*, 195 F.3d 47, 50 (D.C. Cir. 1999).

This case concerns payments made by APA members to support the APAPO. According to the complaint, APA leadership "[r]ecogniz[ed] that many of its members would not want to voluntarily pay to fund" the APAPO's lobbying activities. Compl. ¶ 6. In order to "maximize lobbying funds," the APA therefore "misrepresented" to its "clinician[]" members that they were required to pay a special assessment fee to maintain APA membership. Compl. ¶¶ 6, 15, 16. Payment of the special assessment, however, was not in fact a requirement of APA membership. According to

4

plaintiffs, the APA could not condition membership on payment of that fee without jeopardizing the organization's § 501(c)(3) tax status.

The APA allocated special assessment fee proceeds to the APAPO. Compl. ¶¶ 4, 6, 16. In 2009, the special assessment was $137 per person while regular APA dues were $238. Compl. ¶ 21.

B.

In October 2010, an APA member residing in California filed a class-action lawsuit against the APA and APAPO in the federal district court for the District of Columbia. The following month, a Tennessee resident filed a similar suit. The district court consolidated the two actions at the plaintiffs' request.

The consolidated complaint asserts a nationwide class of "[a]ll persons in the United States who paid a 'special' . . . assessment fee as part of their APA annual dues after 2000." Compl. ¶ 31. It also describes subclasses of "[a]ll persons in California" and "[a]ll persons in Tennessee" who paid the fee. Compl. ¶ 32. The complaint includes three causes of action. Count I, "Unjust Enrichment and Constructive Trust," alleges that the APA intentionally misled class members into paying the special assessment by misrepresenting that it was a requirement of APA membership. *See* Compl. ¶¶ 33-39. That count seeks restitution and disgorgement of the defendants' "wrongful profits." Compl. ¶ 38. Counts II and III, limited to the subclass of California residents, allege violations of California's Unfair Competition Law and California's False Advertising Law, respectively, based on the same underlying conduct. *See* Compl. ¶¶ 40-53.

In May 2012, the district court granted defendants' motion to dismiss all counts. *In re APA Assessment Fee Litig.* (*APA I*), 862 F. Supp. 2d 1, 14 (D.D.C. 2012). First, the court dismissed the unjust enrichment claim, explaining that unjust enrichment is an "equitable quasi-contract claim" that cannot proceed when an "actual contract exists between the parties" that "cover[s] the issue under dispute." *Id.* at 7. Here, the APA bylaws and rules constituted such a contract, the court held, precluding any unjust enrichment claim related to membership fees. *Id.* at 7-9. Second, the court dismissed the two California-law claims upon concluding, based on a choice-of-law analysis, that D.C. law governed the dispute. *Id.* at 11-14. Finally, acknowledging that the plaintiffs had sought to amend their complaint to allege two new causes of action for fraudulent inducement and rescission if the court dismissed the unjust enrichment claim, the court ordered supplemental briefing on whether the proposed amendments would be futile. *Id.* at 10-11. The parties filed supplemental briefs, in which the plaintiffs additionally requested to add a third cause of action for negligent misrepresentation.

In February 2013, the district court rejected plaintiffs' proposed amendments as futile. *See In re APA Assessment Fee Litig.* (*APA II*), 920 F. Supp. 2d 86, 90 (D.D.C. 2013). The court stated that "all three proposed counts require an actionable misrepresentation as well as reasonable reliance by plaintiffs on that misrepresentation." *Id.* at 88. In the court's view, all three claims failed on the reasonable reliance prong. *Id.* at 89. In a footnote, the court found the rescission count "independently barred because plaintiffs' membership contracts with APAPO have been fully performed, and the parties cannot be returned to the pre-contractual status quo." *Id.* at 90 n.3. The negligent misrepresentation count was "independently barred" as well "because plaintiffs did not ask

to add it in their opposition to defendants' motion to dismiss, and the request now is untimely." *Id.*

Plaintiffs now appeal the district court's dismissal of their unjust enrichment and California-law claims as well as the denial of their motion for leave to amend their complaint.

## II.

We first consider the district court's dismissal of plaintiffs' unjust enrichment claim. In the district court, the parties agreed that choice-of-law analysis was unnecessary for that claim because the unjust enrichment law of the various potential jurisdictions is identical. In light of the parties' stance, the district court applied D.C. law to the unjust enrichment claim. On appeal, neither party contends that any other jurisdiction's law should govern resolution of that claim. Under D.C. law, "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005); *see also Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 813-14 (D.C. 2009). "In such a case, the recipient of the benefit has a duty to make restitution to the other person . . . ." *4934, Inc. v. D.C. Dep't of Emp't Servs.*, 605 A.2d 50, 55 (D.C. 1992) (citing Restatement (First) of Restitution § 1 cmt. c (1937)). Reviewing the issue de novo, *see Peart*, 972 A.2d at 814, we reverse the district court's dismissal of the unjust enrichment count.

## A.

Unjust enrichment is an equitable quasi-contract claim "based on a contract implied in law." *Peart*, 972 A.2d at 813-

14. Such a claim is a "[l]egal fiction" designed "to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *4934, Inc.*, 605 A.2d at 55 (alteration in original) (quoting Black's Law Dictionary 324 (6th ed. 1990)). Unjust enrichment will not lie when "the parties have a contract governing an aspect of [their] relation," because "a court will not displace the terms of that contract and impose some other duties not chosen by the parties." *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996). That rule does not apply, however, if the contract is invalid or does not cover the issue in dispute. *See Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 135 (D.D.C. 2009). As summarized by the Restatement, "[a] valid contract defines the obligations of the parties *as to matters within its scope*, displacing to that extent any inquiry into unjust enrichment." Restatement (Third) of Restitution & Unjust Enrichment § 2(2) (2011) (emphasis added).

Here, the district court considered plaintiffs' unjust enrichment claim to be precluded by an express contract—namely the APA bylaws and Association Rules, which "can be 'construed as a contractual agreement between the organization and its members.'" *APA I*, 862 F. Supp. 2d at 7 (quoting *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005)). Urging us to accept that reasoning, defendants contend that the existence of an express membership contract between the parties precludes plaintiffs' unjust enrichment claim.

We reject that approach. According to defendants, plaintiffs' decision to pay the special assessment had no bearing on plaintiffs' rights or obligations as APA members under the bylaws and rules. Defendants in fact allow that

nothing in the bylaws and rules "even *permits* APA to terminate membership based on nonpayment" of the special assessment. Appellee Br. 53. But if that is so, payment of the special assessment at no point formed any part of the explicit contractual arrangement between the APA and its members. It was instead an extra-contractual payment falling outside the "scope" of the governing contracts. *See* Restatement (Third) of Restitution & Unjust Enrichment § 2(2) (2011). The bylaws and rules then pose no obstacle to an unjust enrichment claim seeking to recover assessment fees paid. As the Restatement explains, "[r]estitution claims of great practical significance" do arise "in a contractual context" when the contract does not "regulate the parties' obligations" in relevant part. *Id.* § 2 cmt. c.

Plaintiffs' claim, in fact, fits a standard pattern of unjust enrichment recovery. According to the complaint, defendants included misleading language on the dues statement in order to deceive plaintiffs into overpaying for APA membership. Plaintiffs seek recovery of the alleged overpayments. They thus base their claim on a theory of "[m]istaken payment of money not due"—"one of the core cases of restitution." *Id.* § 6 cmt. a. The goal is "to bring the transfers between the parties into conformity with the true state of their contractual obligations." *Id.* § 6 cmt. c. The Restatement offers the following illustrative example:

> Landlord erroneously bills Tenant for rent at $1000 per month, which Tenant pays. In fact, the lease calls for a monthly rent of $500. Tenant has a claim in restitution to recover the overpayment.

*Id.* § 6 cmt. c, illus. 9. Tenant can recover the "erroneously bill[ed]" $500, despite the existence of an express contract defining the amount of rent due.

Here, plaintiffs likewise can seek to recover the "erroneously bill[ed]" special assessment fee, notwithstanding the existence of an express contract defining APA membership requirements. As the Restatement explains: "Payments resulting from a misunderstanding of the extent of . . . a contractual obligation present a characteristic issue of restitution." *Id.* § 6 cmt. c; *see also id.* § 13 cmt. a (noting an additional basis for relief when erroneous overpayment is induced by fraud). Defendants' basic position, that an unjust enrichment claim is precluded whenever it *relates* to the subject matter of an express contract, would eliminate not just plaintiffs' claim but the entire category of mistaken overpayments—"a characteristic issue of restitution." *Id.* § 6 cmt. c. We have little doubt that District of Columbia courts would reject such an approach.

Defendants rely heavily on a footnote in *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193 (D.C. 1997). The plaintiff in *Schiff*, a member of the American Association of Retired Persons, sued the organization over alleged misrepresentations in the sale of insurance policies. The D.C. Court of Appeals affirmed the dismissal of the plaintiff's unjust enrichment claim, finding it to be precluded by two express contracts. *See id.* at 1194 n.2. According to defendants, *Schiff* requires dismissing the unjust enrichment claim here as well. But *Schiff* contains no description of the terms of the contracts at issue. *See id.* Insofar as the terms of the contracts governed the matter in dispute, they precluded an unjust enrichment claim. *See* Restatement (Third) of Restitution & Unjust Enrichment § 2(2) (2011). We have no basis to read the *Schiff* footnote to denote an intention to go considerably further than that—i.e., to lop off, as defendants' urge here, a major category of unjust enrichment recovery by eliminating relief for mistaken overpayments. Declining

defendants' invitation to read the decision so broadly, we hold that plaintiffs' unjust enrichment claim is not precluded by an express contract.

B.

Defendants argue next that their retention of the assessment fees is not "unjust." According to defendants, plaintiffs were fully aware that the special assessment funded the APAPO's advocacy activities, and plaintiffs allege no inadequacy in the organization's lobbying efforts. Because plaintiffs therefore received all the benefits they were promised in exchange for the assessment fees, defendants contend, it is "just" for defendants to retain the fees paid.

Defendants' argument erroneously assumes that the promise of APAPO advocacy activities induced plaintiffs to pay the special assessment in the first place. Plaintiffs, however, assert that they had no interest in APAPO lobbying. Rather, they paid the special assessment to attain (or retain) APA membership, and only because defendants intentionally misled them into believing that the assessment was a precondition to their doing so. In those circumstances, defendants' subsequent performance of APAPO lobbying activities cannot render "just" their retention of the assessment fees. Under the Restatement's landlord/tenant example, for instance, suppose the landlord intentionally overbills the monthly rent by $500 but also includes an additional promise to perform lobbying activities on behalf of renters. A tenant who pays the overbilled $500 because she believes the rental contract so requires does not lose her unjust enrichment claim if the landlord performs the lobbying services. The landlord cannot immunize himself from an unjust enrichment claim by performing services that the tenant never desired in the first place. Here, the APAPO's

lobbying activities similarly cannot defeat plaintiffs' unjust enrichment claim. The decisions relied on by defendants do not suggest otherwise because they involved no material misrepresentation at contract formation like those alleged by plaintiffs here. *See, e.g.*, *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 62-66 (D.C. 2005).

## C.

Defendants' final argument on the unjust enrichment claim is that it was not *reasonable* for plaintiffs to believe that payment of the special assessment was required for APA membership. As a threshold matter, defendants do not fully explain why plaintiffs' unjust enrichment claim would fail under D.C. law if plaintiffs had genuinely, but unreasonably, been misled by the dues statement's language. *Cf.* Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. a (2011) ("As in other cases of benefit conferred by mistake, the fact that the claimant may have acted negligently in making a mistaken payment is normally irrelevant to the analysis of the claim."). But assuming plaintiffs must demonstrate reasonable reliance, they have amply satisfied their burden. That is particularly so in light of the stage of the proceedings in this case. Defendants seek to prevail at the motion-to-dismiss stage even though the "reasonableness of . . . reliance upon a misrepresentation is a question of fact, for which disposition by [pre-trial motion] is generally inappropriate." *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C. 1987).

We focus our analysis on the "2001 Membership Dues Statement," *see* J.A. 77, which defendants appended to their motion to dismiss, and which mirrored dues statements from subsequent years in relevant respects. The dues statement's

first page contained a worksheet for calculating the payment owed. Line 1 of the worksheet, appearing in a box titled "REGULAR APA DUES," came preprinted with a "2001 dues" amount of $219. *Id.* Line 10, the "2001 Special Assessment," appeared in the next box, also with a preprinted amount (of $110). *Id.* The only other preprinted figure on the statement was $329 on line 14—denoted "SUBTOTAL DUES AND ASSESSMENTS"—a subtotal of lines 1 and 10. *Id.* Below the subtotal line, in a box labeled "VOLUNTARY CONTRIBUTIONS," members could make optional donations to several enumerated funds and foundations. The voluntary contributions, unlike the "2001 dues" and "2001 Special Assessment," contained no preprinted amount.

The first page of the worksheet in the dues statement contained several indications that payment of the special assessment was a requirement of APA membership. First, the name itself—"Special Assessment"—suggested that payment was mandatory. *See Merriam-Webster Unabridged Dictionary* (online ed. 2014) (defining "assessment" as "an amount that a person is *officially required to pay* especially as a tax") (emphasis added). Second, the fact that the special assessment came with a preprinted amount on the form, both on its own line and as part of a subtotal combined with the regular dues, implied that the assessment, like the regular dues, was required for APA membership. That implication was further reinforced by the various "VOLUNTARY CONTRIBUTIONS" listed in a box found immediately next on the form, the presence of which indicated that the preprinted fees above that box were *not* voluntary.

Although the dues statement alone suffices at the motion-to-dismiss stage to defeat defendants' arguments about the reasonableness of plaintiffs' beliefs, there is considerably more. For each line of the dues statement, the accompanying

instructions contained an "EXPLANATION" column and an "ACTION REQUIRED" column. J.A. 79. The instructions for the special assessment fee stated in the "EXPLANATION" column: "An annual assessment *is applied* to all licensed health care psychologists who provide services in the health or mental health field or who supervise those who do." *Id.* (emphasis added). The explanation then listed categories of practicing psychologists who "MUST PAY" the special assessment. *Id.* The mandatory "MUST PAY" language in the "EXPLANATION" column appeared alongside an entry in the "ACTION REQUIRED" column for the special assessment. That entry directed members to "*Pay $110 (the preprinted amount) unless you hold a full-time faculty position." *Id.* What is more, the instructions went on to list "SPECIAL ASSESSMENT EXEMPTIONS": six defined categories of members who did not have to pay the assessment and who therefore could "cross off the amount." *Id*. The enumerated exemptions fortified the impression that *non*-exempt members could not "cross off" the preprinted assessment fee if they wished to retain APA membership. Finally, the instructions for line 19—the "TOTAL AMOUNT PAYABLE TO APA"—stated that, if a member did not calculate the total himself, "the total of all preprinted dues and assessments will be charged to you." J.A. 80. The inclusion of the special assessment in the default renewal charge cemented the conclusion that that assessment formed part of the minimum payment required for membership.

The functioning of the APA website, as alleged in the complaint, is entirely of a piece with the indications in the dues statement and accompanying instructions of the mandatory nature of the special assessment. According to the complaint, the website stated for a "period of years" that members "must pay the Special Assessment." J.A. 60 (internal quotation marks omitted). The website also stated

"repeatedly" that "all practicing APA members were billed the practice assessment and were expected to pay" it. *Id.* Moreover, the website did not allow members to pay their APA dues without paying the special assessment. *Id.* A member who viewed the dues statement in conjunction with the website therefore had even greater reason to believe that payment of the special assessment was a condition of APA membership.

In the face of all of those indications that the special assessment was a requirement for APA membership, defendants highlight an instruction for line 2 of the dues statement (pertaining to amounts still owed from past years) which stated that "[b]asic dues are required for continuous membership." J.A. 78. Noting that the same language did not appear in the instructions for the special assessment, defendants contend that any reasonable reader would have drawn the inference that the special assessment was not "required for continuous membership." *Id.* The instruction for line 2, however, would have no relevance for any member who had no carryover balance from prior years. At any rate, any negative inference from that instruction of the kind suggested by defendants would not begin to overcome the overwhelming indications to the contrary, particularly for purposes of resolving defendants' motion to dismiss. For instance, a member might well have reasonably concluded that the emphatic "MUST PAY" instruction for the special assessment was a shorthand equivalent of the "required for continuous membership" language from the line 2 instructions.

Defendants also assert, without support, that the "MUST PAY" instruction and similar language intended to convey only that the special assessment was a "professional obligation of practicing APA members" as opposed to a

requirement for membership. Appellee Br. 29. We cannot consider that assertion at the motion-to-dismiss stage because it does not appear in the complaint or in any other document in the limited record before us. *See Navab-Safavi v. Glassman*, 637 F.3d 311, 318 (D.C. Cir. 2011). And even if we could consider it, there would be no basis for concluding at the motion-to-dismiss stage that members should have perceived a distinction between a "professional obligation" and a "membership obligation" and understood that the special assessment fell into the former category, much less that they should have done so when examining a statement and accompanying instructions entitled, "*Membership* Dues." J.A. 77, 79 (emphasis added).

We are equally unmoved by defendants' effort to overcome the language of the dues statement and instructions by reference to the APA bylaws and rules. Defendants cite *Clark v. Mutual Reserve Fund Life Ass'n*, 14 App. D.C. 154, 169 (D.C. 1899), for the proposition that "[m]embers of a mutual association are conclusively presumed to know its constitution and by-laws." Assuming the continuing force of that proposition as a matter of District of Columbia law, nothing in the bylaws or rules would have cast doubt on the reasonableness of plaintiffs' beliefs about the mandatory nature of the special assessment. Defendants highlight language in the bylaws' "Dues and Subscriptions" section authorizing the APA to impose "basic Association dues to be paid annually by Members." J.A. 158. Neither the bylaws nor the rules, defendants observe, specifically mentioned the special assessment as a condition of membership (or otherwise). But defendants fail to explain why it would have been unreasonable for a member to believe that the special assessment was merely a particular type of APA "due[]"—a term undefined in the bylaws and rules. After all, the special assessment appeared, preprinted, on the annual APA

"Membership *Dues* Statement," J.A. 77 (emphasis added), as something members "MUST PAY." J.A. 79.

Finally, defendants contend that plaintiffs had a duty to investigate further before concluding that the special assessment was required for APA membership. *See, e.g.*, *Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 576 (D.C. 2011). For the reasons already explained, however, plaintiffs reasonably could have concluded that the meaning of the dues statement was clear, such that there was no reason to investigate further. The circumstances here are also distinguishable from the cases relied on by defendants in which D.C. courts have "imposed a very high standard *on sophisticated business entities* claiming fraudulent inducement in arms-length transactions." *Id.* at 575-76 (internal quotation marks omitted) (emphasis added). Plaintiffs here were not engaged in arms-length, adversarial business dealings but instead were seeking membership in a reputable national professional organization. In that setting, there is no reason to conclude that D.C. courts would impose on a would-be member any heightened duty to investigate before relying on facially straightforward billing language.

For those reasons, we conclude that plaintiffs' unjust enrichment claim survives defendants' motion to dismiss. We therefore reverse the district court's dismissal of that claim.

III.

Plaintiffs next appeal the dismissal of their California statutory claims. The complaint alleges a violation of California's Unfair Competition Law, *see* Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and of California's False Advertising Law, *see id.* §§ 17500 *et seq.* The district court dismissed

both claims upon concluding that District of Columbia—not California—law governed the dispute. *See APA I*, 862 F. Supp. 2d at 11-14. We review the district court's choice-of-law determination de novo, *see Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009), and we affirm.

A federal court sitting in diversity must apply the choice-of-law rules of the forum state—here, the District of Columbia. *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1107 (D.C. Cir. 2008). D.C. law employs "a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006) (quoting *Moore v. Ronald Hsu Constr. Co.*, 576 A.2d 734, 737 (D.C. 1990)) (internal quotation marks omitted).

The D.C. Court of Appeals' 2006 decision in *Washkoviak* provides an instructive model for the choice-of-law analysis in this case. The plaintiffs in that case were Wisconsin students with loans held by Sallie Mae, a congressionally created private corporation that "serve[s] as a secondary market and warehousing facility for student loans." 900 A.2d at 171. Asserting claims under a D.C. consumer-protection statute, plaintiffs alleged that "Sallie Mae makes affirmative misrepresentations that cause borrowers to incur late fees continuously." *Id.* at 174. Sallie Mae moved to dismiss, arguing that Wisconsin—not D.C.—law governed the case.

Applying D.C.'s choice-of-law rules, the D.C. Court of Appeals held that, for purposes of resolving the motion to dismiss, D.C. law applied. *See id.* at 180-83. "Wisconsin has a powerful interest in protecting its residents from fraud and misrepresentation," the court noted, "while the District of Columbia has an equally strong interest in ensuring that its

corporate citizens refrain from fraudulent activities." *Id.* at 180-81. Given the "equal[]" interests at stake, the court turned to the Restatement (Second) of Conflict of Laws (1971), finding that a "qualitative weighing" of the factors set forth in §§ 145 and 148 did not clearly favor either jurisdiction. *Id.* at 182 & n.18. The court applied the law of the forum state (D.C.) as a tie-breaker. *Id.* at 182. With *Washkoviak* as our guide, we examine whether California or D.C. law applies to plaintiffs' statutory claims.

A.

Initially, we must "determine whether a 'true conflict' exists" between the laws of the two jurisdictions—"that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different." *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (citing *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970)). A "false conflict" exists, on the other hand, "when the policies of one state would be advanced by the application of its law and the policies of the states whose laws are claimed to be in conflict would not be advanced by application of their law[s]." *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (citing *Biscoe v. Arlington Cnty.*, 738 F.2d 1352, 1360 (D.C. Cir. 1984)). In that event, we "apply the law of the state whose policy would be advanced by application of its law." *Id.*

We begin by identifying the policies underlying the laws of both jurisdictions. Plaintiffs invoke the protections of California's Unfair Competition Law and California's False Advertising Law. Both statutes manifest California's "obvious interest in protecting its residents" from fraud. *APA I*, 862 F. Supp. 2d at 13; *cf. Aral v. Earthlink, Inc.*, 36 Cal. Rptr. 3d 229, 244 (Cal. Ct. App. 2005) (emphasizing "the

right of California to ensure that its citizens have a viable forum in which to recover minor amounts of money allegedly obtained in violation of the [Unfair Competition Law]"); *Washkoviak*, 900 A.2d at 180 ("Wisconsin has a powerful interest in protecting its residents from fraud and misrepresentation.").

The dispute here centers on what interest, if any, underlies District of Columbia law. The most relevant statute identified by the parties is D.C.'s Consumer Protection Procedures Act (CPPA), D.C. Code §§ 28-3901 *et seq.*, the same statute at issue in *Washkoviak*. "The CPPA prohibits a wide variety of deceptive trade practices perpetrated against consumers." *Busby v. Capital One, N.A.*, 772 F. Supp. 2d 268, 279 (D.D.C. 2011) (citing D.C. Code. § 28-3904).

Both sides agree that the CPPA does not provide plaintiffs with a cause of action. Plaintiffs do not appear to have been acting as "consumer[s]" within the meaning of the statute when they paid the special assessment: they did not "purchase, lease . . . , or receive consumer goods or services," that is, goods or services "normally use[d] for personal, household, or family purposes." D.C. Code § 28-3901(a)(2)(A), (B)(i). Moreover, the CPPA expressly provides that any "action . . . against a nonprofit organization *shall not be based on membership in such organization*, membership services, . . . or any other transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business." D.C. Code § 28-3905(k)(5) (emphasis added). Plaintiffs' claims fall directly within the nonprofit-membership exclusion.

Plaintiffs argue that there is a "false conflict" here because California statutes authorize their suit while the CPPA does not. *See Fresh Start Indus., Inc. v. ATX*

*Telecomms. Servs.*, 295 F. Supp. 2d 521, 527 (E.D. Pa. 2003). But the District of Columbia's failure to provide a statutory cause of action does not necessarily demonstrate that it has no underlying interest at stake. To the contrary, a "rule which exempts the actor from liability for harmful conduct" may embody an interest in protecting "defendants against being harassed by such actions." Restatement (Second) of Conflict of Laws § 145 cmt. c (1971).

For example, in *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697 (D.C. 2013), the D.C. Court of Appeals found a conflict between the consumer protection laws of Massachusetts and the CPPA. The Massachusetts statute allowed suits "against an attorney who acts unfairly or deceptively in the rendition of legal services," while the CPPA "specifically exclude[d] attorneys" from its reach. *Id.* at 714. "This distinction between Massachusetts and D.C. law," the court concluded, "demonstrates that the two laws are in conflict." *Id.* We understand that decision to recognize that a rule of non-liability—reflecting a legislative purpose to protect defendants from litigation—can be owed "the same consideration in the choice-of-law process as is a rule which imposes liability." Restatement (Second) of Conflict of Laws § 145 cmt. c (1971); *see also Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 195 (D.C. Cir. 1999).

For that reason, we find a true conflict here. Although a rule of non-liability can reflect a goal other than protecting defendants from litigation, the available evidence suggests that the D.C. Council acted specifically to shield nonprofit organizations from statutory liability for membership-related disputes. The Council revised the CPPA in 2007 to expose nonprofits otherwise acting as "merchants" to the same level of liability as for-profit corporations. *See* Nonprofit Organizations Oversight Improvement Amendment Act of

2007, 2007 D.C. Legis. Serv. (West). But the Council went only so far: it explicitly barred claims, like plaintiffs', relating to organizational membership. *See* D.C. Code § 28-3905(k)(5). The amendment's legislative history indicates a concern with appropriately calibrating the level of nonprofit liability. "The goal of nonprofit regulation," states one committee report, "should be to ferret out and prosecute fraudulent activities, *while not imposing unnecessary burdens that have little benefit but limit nonprofits' effectiveness*." D.C. Council, Comm. on Pub. Safety and the Judiciary, Rep. on B. 17-53, at 2 (Feb. 28, 2007) (emphasis added).

Given that D.C.'s rule of non-liability is owed "the same consideration in the choice-of-law process as is a rule," like California's, "which imposes liability," Restatement (Second) of Conflict of Laws § 145 cmt. c. (1971), we find that the laws of the relevant jurisdictions "are in conflict." *Pietrangelo*, 68 A.3d at 714. The two jurisdictions' interests therefore are "equally strong." *Washkoviak*, 900 A.2d at 181.

## B.

The next step entails evaluating "the two jurisdictions' respective relationships to the complaint" under the factors set forth in the Restatement (Second) of Conflict of Laws. *Washkoviak*, 900 A.2d at 181. D.C. courts follow § 145 of the Restatement, which provides four factors to identify the jurisdiction with the "most significant relationship to the occurrence and the parties" in tort cases. Restatement (Second) of Conflict of Laws § 145(1) (1971). Those factors are:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Applying the first § 145 factor, *Washkoviak* held that the place of injury was Wisconsin, where the plaintiffs "received the alleged misrepresentations and made their payments." 900 A.2d at 181. Similarly, the place of injury here was California, where the relevant subclass of plaintiffs received their dues statements and presumably paid the special assessments. According to *Washkoviak*, though, the place of injury holds a "discounted value . . . in cases, such as this one, involving claims of misrepresentation." *Id.* at 182.

The *Washkoviak* court found that the second § 145 factor, "the place where the conduct causing the injury occurred," favored District of Columbia law. Plaintiffs had alleged that Sallie Mae's injurious conduct was "formulated and conceived . . . in the District of Columbia[,] . . . directed . . . from the District of Columbia, and emanated from . . . the District of Columbia." *Id.* at 181 (alteration in original). Here, plaintiffs have not alleged where defendants drafted the dues statements or otherwise formulated and transmitted the alleged misrepresentations. But as the district court noted, the complaint contends that "defendants had their principal place of business in Washington, D.C., and that 'significant events giving rise to this case took place in this District.'" *APA I*, 862 F. Supp. 2d at 13 (quoting Compl. ¶ 9). We agree with the district court that the second factor weighs at least

moderately towards D.C. law given that neither side has "suggest[ed] any other location where the conduct could have occurred." *Id.* We reject plaintiffs' unexplained assertion that the defendants' use of a website to convey information should alter the analysis.

The third § 145 factor is "the domicil, residence, nationality, place of incorporation and place of business of the parties." *Washkoviak* found that factor to result in a tie because the plaintiffs resided in Wisconsin while Sallie Mae was located in the District of Columbia. 900 A.2d at 181. For the same reason, the third factor is "split evenly" between California and D.C. here. *See id.* Plaintiffs argue in favor of California law based on Restatement commentary stating that the "domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant." Restatement (Second) of Conflict of Laws § 148 cmt. i (1971). That argument is foreclosed by *Washkoviak*.

Finally, for the fourth § 145 factor—"the place where the relationship, if any, between the parties is centered"—*Washkoviak* found the relationship "centered" in Wisconsin based on case law specific to borrower/lender relationships. *See* 900 A.2d at 181. In our case, the parties cite no case law directly addressing where the relationship between a national nonprofit organization and its members is "centered." We therefore find that "the fourth factor does not weigh strongly in favor of either party." *APA I*, 862 F. Supp. 2d at 13.

Balancing the four factors, the *Washkoviak* court found that they did not favor application of either jurisdiction's law. *See* 900 A.2d at 182. Although two factors favored Wisconsin and only one favored D.C (with one evenly split), the court held that "a mere counting of contacts is not what is involved." *Id.* at 181 (internal quotation marks omitted).

Rather, "[g]iven the discounted value of the place of injury," the court could not "say that a qualitative weighing of the factors clearly favors Wisconsin." *Id*. at 182.

We reach the same conclusion here. Although the fourth § 145 factor does not weigh strongly in favor of either party— unlike in *Washkoviak*, where it pointed to Wisconsin law— any difference from that factor is offset, in our view, by the second factor's weighing more weakly towards D.C. here due to the relative dearth of factual allegations concerning the location of defendants' conduct. We therefore "cannot say that a qualitative weighing of" the § 145 factors favors either California or D.C. law. *See id.* That result remains unchanged by consideration of Restatement § 148, "Fraud and Misrepresentation." *See id.* at 182 n.18 (applying the § 148 factors "qualitatively rather than quantitatively" and concluding that the result was, "at best, ambiguous").

## C.

Faced with a conflict between jurisdictions, with neither jurisdiction's law favored by the Restatement factors, the *Washkoviak* court concluded that the law of the forum state governed. *Id.* at 182; *see also Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) ("D.C. choice-of-law rules require, in a case where the [Restatement] factors do not point to a clear answer, that we apply D.C. tort law, the law of the forum state."). Finding ourselves in a comparable situation, we reach the same result. As the district court observed, that outcome "works no unfairness to plaintiffs, because they chose to pursue their claim in the District of Columbia." *APA I*, 862 F. Supp. 2d at 14. We therefore affirm the district court's dismissal of plaintiffs' California-law claims.

25

IV.

Plaintiffs' final challenge concerns the district court's denial of their motion to amend the complaint to add claims for fraudulent inducement, rescission, and negligent misrepresentation.

A.

The district court denied, as futile, plaintiffs' request to add a claim for fraudulent inducement. *See APA II*, 920 F. Supp. 2d at 90. We review a denial based on futility de novo, *see In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010), and we reverse.

The essential elements of a D.C. common-law fraud claim are "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 860-61 (D.C. 1999) (internal quotation marks omitted). In certain cases, the plaintiff must also show "(6) that the defrauded party's reliance [was] *reasonable*." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992) (emphasis in original); *see also In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 100 n.13 (D.D.C. 2003). The district court held that plaintiffs' proposed claim failed based on its conclusion that any reliance here was unreasonable. *See APA II*, 920 F. Supp. 2d at 90. On appeal, plaintiffs argue that *reasonable* reliance is not a required element of their claim. We need not resolve the issue because, as explained, plaintiffs have adequately pled reasonable reliance here. *See supra* Part II.C. We thus hold that the district court erred in denying, as futile, plaintiffs' motion to add a fraudulent inducement claim.

B.

The district court also denied plaintiffs' motion to add a rescission claim. To "justify rescission of a contract based on a misrepresentation," D.C. law requires a plaintiff to "establish, by a preponderance of the evidence, (i) a misrepresentation, (ii) made in reference to a material fact, that (iii) 'would have been likely to have induced a reasonable recipient to make the contract.'" *Fennell v. AARP*, 770 F. Supp. 2d 118, 132 (D.D.C. 2011) (quoting *In re Estate of McKenney*, 953 A.2d 336, 342 (D.C. 2008)). A plaintiff prevailing on a rescission claim can set aside the contract, thereby "restor[ing] the aggrieved party to that party's position at the time the contract was made as opposed to seeking damages for breach of contract." *In re Estate of Johnson*, 820 A.2d 535, 539 (D.C. 2003). Here, the district court denied plaintiffs' motion to amend, again finding that any reliance on the alleged misrepresentations was unreasonable. *See APA II*, 920 F. Supp. 2d at 90. As before, we find that conclusion to have been in error.

The district court, however, also found the rescission count "independently barred because plaintiffs' membership contracts with APAPO have been fully performed, and the parties cannot be returned to the pre-contractual status quo." *APA II*, 920 F. Supp. 2d at 90 n.3. "[I]nherent in the remedy of rescission is the return of the parties to their pre-contract positions." *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001). As a result, "a party seeking rescission must restore the other party to that party's position at the time the contract was made. This rule applies even when the party against whom rescission is sought has committed fraud." *Id.* (internal citation omitted). While plaintiffs point to other jurisdictions that allow rescission "despite the impossibility or

undesirability of complete restoration," *e.g., Baney Corp. v. Agilysys NV, LLC*, 773 F. Supp. 2d 593, 607 (D. Md. 2011), they identify no District of Columbia cases adopting that approach. Given plaintiffs' concession that "it is not possible . . . [to] restore the status quo ante" in this case, Appellant Br. 60, we agree with the district court that plaintiffs' proposed rescission claim fails as a matter of D.C. law.

## C.

Finally, the district court denied, as futile, plaintiffs' request to add a cause of action for negligent misrepresentation. *See APA II*, 920 F. Supp. 2d at 90. As with the fraudulent inducement and rescission claims, the court held that the negligent misrepresentation claim failed because any reliance on defendants' alleged misrepresentations was not reasonable. *See id.* We once again reject that conclusion.

The district court, however, also found the negligent misrepresentation count "independently barred because plaintiffs did not ask to add it in their opposition to defendants' motion to dismiss, and the request now is untimely and outside the scope of the supplemental briefing." *APA II*, 920 F. Supp. 2d at 90 n.3. We find no abuse of discretion in that decision. *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). As the court noted in its May 2012 order, plaintiffs asked to add only two claims to their complaint: fraudulent inducement and rescission. *See APA I*, 862 F. Supp. 2d at 10-11. Plaintiffs' request made no mention of negligent misrepresentation. The district court correspondingly ordered supplemental briefing limited to fraudulent inducement and rescission. *See id.* In their supplemental briefing, plaintiffs proposed a third claim for negligent misrepresentation without seeking permission to

do so. Under the circumstances, the district court did not abuse its discretion by declining to consider a proposed claim outside the scope of the ordered briefing.

Plaintiffs, however, have not permanently relinquished any opportunity to follow proper procedures. We thus reverse the district court's decision insofar as it dismissed the negligent misrepresentation claim *with prejudice*. On remand, plaintiffs may file a procedurally regular motion requesting leave to add a negligent misrepresentation claim to their complaint. *See* Fed. R. Civ. P. 15. The district court may not deny such a motion based solely on timeliness unless the defendants can show undue prejudice. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) ("Where an amendment would do no more than clarify legal theories or make technical corrections, we have consistently held that delay, without a showing of prejudice, is not a sufficient ground for denying the motion.").

\* \* \* \* \*

For the foregoing reasons, we affirm in part and reverse in part the district court's orders. We reverse the dismissal of plaintiffs' unjust enrichment claim and the denial of plaintiffs' request to add a fraudulent inducement claim. We affirm the dismissal of the California-law claims as well as the denial of plaintiffs' requests to add claims for rescission and negligent misrepresentation. For the negligent misrepresentation claim, however, we reverse to the extent that the dismissal was with prejudice. We remand for proceedings consistent with this opinion.

*So ordered.*